**BERKS COUNTY, Petitioner**

v.

**DEPARTMENT OF ENVIRONMENTAL PROTECTION, and FR&S, Inc., and Pioneer Crossing Landfill, Respondents.**

Commonwealth Court of Pennsylvania.

Argued Dec. 15, 2005.

Decided Feb. 28, 2006.

Charles E. Gutshall and Kenneth L. Joel, Harrisburg, for petitioner.

Craig S. Lambeth, Asst. Counsel, Harrisburg, for respondent, Department of Environmental Protection.

William F. Fox, Jr., Harleysville, for respondent, FR&S, Inc. and Pioneer Crossing Landfill.

BEFORE: McGINLEY, Judge, and SIMPSON, Judge, and LEAVITT, Judge.

OPINION BY Judge McGINLEY.

Berks County (Petitioner) petitions for review of an order of the Environmental Hearing Board (EHB) which denied its appeal from the Pennsylvania Department of Environmental Protection's (DEP) issuance of a major modification to Solid Waste Permit No. 100346. The modification authorized FR & S, Inc. (Permittee), owner of the Pioneer Crossing Landfill (Landfill), to increase the Landfill's average and maximum daily volumes and expand its existing operation.

The Landfill is an existing municipal waste facility located in the southeast corner of Exeter Township, Berks County, Pennsylvania, in close proximity to Amity, Robeson and Union Townships.

The Landfill is regarded as a "small volume landfill." Prior to the permit at issue, the Landfill was authorized to accept an average daily volume of 1,000 tons per day and a maximum daily volume of 1,600 tons. As of early 2002 the Landfill neared

full capacity and needed to expand to remain in operation.[1]

On July 13, 2000, the DEP received Permittee's application for major modification to expand the Landfill.[2] Permittee sought to increase the proposed disposal area by 67 acres and increase the height of the Landfill by 89 feet. The application included an expansion request for an increase in average daily volume to 1,550 tons and the maximum daily volume to 1,975 tons. The application was accompanied by an environmental assessment in accordance with the DEP's regulations at 25 Pa.Code § 271.126 and § 271.127.[3]

On February 13, 2001, the DEP held a public meeting to gather input on the proposed expansion from members of the community. Testimony was provided both in favor and in opposition to the Landfill's proposal. Residents who lived near the Landfill expressed noise, odor and health concerns. On August 8, 2001, the DEP mailed a thirty-page comment/response document to each person who appeared. This document summarized the testimony and included the DEP's response to each concern.

On October 9, 2001, the DEP sent Permittee a letter and asked for additional documentation and information pertaining to the Landfill's proposed odor control measures, proposed truck routes, noise mitigation, and other proposals to offset the visual impact of the Landfill. Permittee responded with the information on October 22, 2001.

On November 30, 2001, the DEP sent a second request seeking additional information and clarification of Permittee's prior submissions. Permittee responded to that letter on December 4 and 7, 2001.

### DEP's January 24, 2002, Harms/Benefits Analysis

On January 24, 2002, approximately one-and-one-half years after the application was filed, the DEP completed its environmental assessment analysis and determined preliminarily that the benefits of the proposed project did not clearly outweigh the harms. The "harms" evaluated by the DEP included: (1) property devaluation, (2) increased trash truck traffic, (3) in-

1. The Landfill was originally permitted by the DEP in 1990, and in 1993 it received a major permit modification to develop certain disposal areas in accordance with the Municipal Waste Management Regulations, 25 Pa.Code § 271.127(c). The Landfill's 10-year permit ran through December, 2003.

2. The DEP is the agency of the Commonwealth of Pennsylvania authorized to administer and enforce, *inter alia*, the Solid Waste Management Act (SWMA), Act of July 7, 1980, P.L. 380, *as amended*, 35 P.S. §§ 6018.101–6018.1003, the Municipal Waste Planning, Recycling and Waste Reduction Act (Act 101), Act of July 28, 1988, P.L. 556, *as amended*, 53 P.S. §§ 4000.101–4000.1904, and the rules and regulations promulgated thereunder, including the Municipal Waste Management Regulations, 25 Pa.Code Chapters 271–285.

3. Sections 271.126 and 271.127 of the DEP's Municipal Waste Management Regulations,

25 Pa.Code § 271.126 and § 271.127, require an applicant to conduct an environmental assessment and demonstrate that the benefits of the project clearly outweigh the known and potential environmental harms that remain after the proposed mitigation. In performing such assessment, social and economic benefits are measured and offset against the social and economic harms. Environmental harms are measured after taking into consideration acceptable mitigation plans. The harms are then balanced against the benefits to determine if the benefits clearly outweigh the harms. The harms and benefits of the proposed project are compared to the conditions that would exist provided the project did not move forward. The balancing of environmental harms against social and economic benefits is referred to as the "harms/benefits" analysis.

creased odors, (4) negative aesthetic impact on surrounding communities, (5) increased noise from landfill equipment back-up alarms, (6) increased litter from landfill and trash trucks, and (7) increased landfill gas emissions. DEP Environmental Assessment, January 24, 2002, at 3–8; Reproduced Record (R.R.) at 2425a–2430a.

The "benefits" considered and accepted by the DEP were: (1) the host municipality benefit fee to Exeter Township in the amounts of $1.50/ton to $2.25/ton, (2) recycling fee in the amount of $2.00/ton paid to the Commonwealth, (3) Environmental Stewardship fee in the amount of $0.25/ton paid to the Commonwealth, (4) continued and additional employment opportunities at the Landfill, (5) Landfill's purchase of local and regional goods exceeding $3 million per year, (6) contribution of two acres of land and $275,000 for relocation of the First Baptist Church and environmental clean-up of that site (contamination which was not caused by Landfill), (7) income and sales taxes to the Commonwealth from Landfill employees, (8) presentations to schools and tours of the Landfill facilities for students, (9) charitable contributions of a minimum $50,000 to local civil, social, athletic, educational, religious and community groups, (10) free township-wide spring clean-up for Exeter Township, (11) free disposal of "white goods"[4] for Exeter Township residents, (12) property tax revenues, and (13) on-site recycling drop-off. DEP Environmental Assessment, January 24, 2002, at 9–11; R.R. at 2431a–2433a.

The DEP considered and rejected ten additional benefits identified by Permittee as either too speculative or not directly related to the permit modification request. Proposed "benefits" DEP rejected because they were not directly related to the permit modification included: the develop-ment of a business park on property located in proximity to and owned by the Landfill and the relocation of fourteen trailer park homes which were located over a former, unrelated landfill. DEP Environmental Assessment, January 24, 2002, at 12–13; R.R. at 2434a–2435a.

The DEP determined that the potential and actual harms of the proposed expansion would disproportionately impact certain nearby communities that were located outside the host community of Exeter Township, including Union and Robeson Townships, and the Borough of Birdsboro. Many of the proposed benefits went directly to residents of Exeter Township, and not to other residents of Berks County who were actually more directly impacted by the Landfill. For example, the additional height and widening of the Landfill would make the Landfill a focal point to residents of Birdsboro Borough. Because the Landfill was located in the southeast corner of Exeter Township, many of its residents were less impacted by the odors, noise and traffic than nearby residents of neighboring Birdsboro Borough, Union and Robeson Townships.

The DEP gave Permittee a fourteen-day "final opportunity" to demonstrate that the benefits of the proposed expansion clearly outweighed the harms. Letter from DEP to Permittee, January 24, 2002, at 1; R.R. at 2421a.

Permittee responded on February 4, 2002. Permittee significantly reduced the proposed height of the Landfill so that the expansion would only result in an increase of 15 feet over the present Landfill instead of the original proposal of 89 feet. Permittee proposed the following additional mitigation of identified harms: (1) elimination of the truck back-up alarms to reduce

4. "White goods" include refrigerators, freezers, washers, dryers, dishwashers, air condi-tioners, stoves, ranges and any similar appliances.

sound of waste trucks dumping at the Landfill, (2) further odor mitigation measures; and (3) construction of higher litter fences around the perimeter of the Landfill. Permittee also identified the following new benefits: (1) a proximity impact fee on a per-ton-of-waste basis to be paid quarterly to Birdsboro Borough Council which amounted to approximately $500,000 per year; (2) acceptance of "white goods" at the Landfill from Birdsboro Borough and Robeson and Union Township residents without a charge; (3) free spring and fall clean-up for Birdsboro Borough, Robeson and Union Township residents; (4) establishment of a drop off recycling center in Birdsboro Borough; (5) development of a 58–acre sports complex and recreational park at the expansion site for use by residents of Exeter, Robeson and Union Townships, and Birdsboro Borough; and (6) restoration and enhancement to 1,250 feet of an "unnamed tributary" to the Schuylkill River. Pioneer Crossing Landfill Response to DEP January 24, 2002 Harms/Benefits Review Letter at 3–13.

### DEP's March 27, 2002, Harms/Benefits Analysis

After reviewing Permittee's final submission pertaining to the harms and benefits of the proposed expansion, the DEP completed the environmental assessment for the project. The DEP concluded that Permittee demonstrated that the social, economic and environmental benefits of the project clearly outweighed the potential social, economic and environmental harms.

The DEP then concluded its "technical review" of the application.

On May 30, 2002, the DEP issued a major modification to the permit and approved an increase in height and average and daily volumes. DEP approved the application with a condition which required Permittee to provide all of the benefits that it described in its application or risk suspension or revocation of its permit. Modification to Solid Waste Disposal and/or Processing Permit No. 100346 at 8; R.R. at 2466a.

The Board of Supervisors of Exeter Township voted to approve and execute a Host Community Agreement[5] with the Landfill the same day.

Petitioner appealed to the EHB and raised various procedural irregularities. Petitioner questioned the way DEP conducted its review of the major modification application, including the timing of the DEP's technical review, and the fact that DEP gave Permittee another chance in January, 2002 to meet the "harms/benefits" test. Petitioner also asserted that the DEP failed to comply with the mandates of "Acts 67 and 68"[6] by failing to consider

5. The Host Community Agreement entered into between the Board of Supervisors of Exeter Township and Pioneer Crossing Landfill on October 30, 2000, settled and resolved potential litigation over the necessity of additional zoning approvals for the Landfill's expansion. R.R. at 2530a–2543a. It was Permittee's position that no additional zoning approvals were needed because of certain vested and grandfathered rights and because of certain actions previously taken or approved by Exeter Township. Exeter Township on the other hand claimed that the proposed expansion required either a variance or an amendment to the existing zoning ordinance. *See* Letter from Exeter Township's legal counsel, Charles Zaleski, dated June 9, 2000, to the DEP; R.R. at 2560a–2566a.

In addition to the "potential" litigation, the Host Community Agreement resolved a separate unrelated lawsuit that was pending and related to the Landfill expansion.

6. The Municipalities Planning Code (MPC), Act of July 31, 1968, P.L. 805, *as amended*, 53 P.S. §§ 10101–11107, was amended by Acts 67 and Act 68 in June of 2000 to include a provision which directs state agencies after August 22, 2000, to give consideration to local

the Exeter Township Zoning Ordinance which does not permit landfills in a light industrial district, and argued that the DEP abused its discretion when it ultimately concluded that the benefits of the project clearly outweighed the harms.

Nine days of hearings were held before the Administrative Law Judge on August 3–6, 2004, August 11–13, 2004, and August 26–27, 2004, which resulted in a transcript of 1,779 pages and several volumes of exhibits. A number of witnesses from the DEP review team who were involved in the "harms/benefits" analysis testified.

Robert G. Benvin (Benvin) was the Regional Facilities Manager at the time of the review of the Permittee's application. Benvin's responsibilities included supervising the engineers, hydrologists, chemists and soil scientists during the technical review. Notes of Testimony, August 3, 2004, (N.T. 8/3/04) at 97; R.R. 97a. Benvin described the technical review as the physical evaluation of the design and construction of the facility, including the design of the landfill, height of the landfill, liner construction, cell construction, groundwater monitoring, and well installation construction. N.T. 8/3/04, at 105; R.R. at 105a. Benvin explained that generally, the environmental assessment occurred before the technical review. He went on to explain that there was "always some amount of technical review that accompanies the Harms Benefit Evaluation" and that "some issues such as height and ... how gas is going to be collected, which are technical issues, sometimes have to be looked at in order to do a Harms Benefit Evaluation." N.T. 8/3/04 at 105–107, 112; R.R. at 105a–107a, 112a.

According to Benvin, the DEP initially undertook a separate "harms/benefits" analysis with respect to Permittee's request for maximum/daily volume increases and the vertical/lateral expansions. However, the DEP later decided to evaluate the application as a whole. N.T. 8/3/04 at 121; R.R. at 121a.

Benvin acknowledged that DEP gave Permittee a final opportunity to submit additional documentation after the DEP's March 27, 2002, review, and explained the reasons for doing so. Benvin testified:

Q. Well, I think you characterized the January 24 document marked as Exhibit 35 as an opportunity to give Pioneer

land use controls when undertaking certain actions such as permitting: "State agencies *shall consider and may rely upon comprehensive plans and zoning ordinances when reviewing applications for the funding or permitting of infrastructure or facilities.*" 53 P.S. § 11105(a)(2) (Emphasis added). 53 P.S. § 10619.2, which was amended by "Act 68" similarly provides: "*Commonwealth agencies shall consider and may rely upon comprehensive plans and zoning ordinances when reviewing applications for the funding or permitting of infrastructure or facilities.*" (Emphasis added). The amendments are commonly referred to as "Act 67/68".

The application herein was submitted to DEP shortly *before* this legislation came into effect in August, 2000. There were no regulations that implemented Act 67/68 in place at the DEP.

However, in August, 2000, DEP developed an "Interim Policy for Consideration of Comprehensive Plans and Zoning Ordinance in DEP Review of Permits for Facilities and Infrastructures" which followed the requirements of Act 67/68. Under its Interim Policy, the DEP required Permittee to complete a DEP Land Use Questionnaire and invited Exeter Township and Berks County to identify potential land use conflicts associated with the proposed project before the DEP completed its review of the permit application. The stated purpose of the interim policy, which the DEP applied to Permittee's pending application, was to "minimize conflict with local land use or new land development." August 21, 2000, DEP Interim Policy at 1; R.R. at 2632a.

Crossing basically another chance, right?

A. Well, that's what it says. We're offering you this final opportunity to demonstrate that the benefits for the project clearly outweigh the harms.

Q. And is one of the reasons you did that is because you believe there was a significant harm that would result from the expansion of the Pioneer Crossing Landfill to Birdsboro and Birdsboro wasn't receiving any benefit at that point?

A. I can't recall if we called it a significant harm, but I think that was one of the issues. We hadn't pointed it out before in our reviews that we were giving that—you know, a major emphasis on Birdsboro and their aesthetic views of the landfill, and I think that is one of the reasons we felt an obligation to give them an opportunity to address that issue.

N.T. 8/3/04 at 147–148; R.R. at 147a–148a.

Lewis Joseph Guerra (Guerra), DEP's Executive Policy Specialist, had primary responsibility for performing the Act 67/68 reviews on Permittee's application. Guerra understood the purpose of the Act 67/68 reviews was to ensure that the DEP decisions were not in conflict with local zoning ordinances and comprehensive plans. Notes of Testimony, August 4, 2004, (N.T. 8/4/04) at 198; R.R. at 198a.

Guerra was aware that there was litigation that involved zoning in Exeter Township. He did not personally review the Exeter Township comprehensive plan, the Exeter Township Zoning Ordinance, the Berks County comprehensive plan or the pleadings which related to then-pending litigation surrounding zoning issues and the Landfill. N.T. 8/4/04 at 198–202; R.R. at 198a–202. However, he forwarded Permittee's Act 67/68 response letter to Exeter Township Board of Supervisors, Berks County Board of Commissioners and Berks County Planning Commission for their review. Specifically, Permittee's response letter indicated that to the extent there may have been issues related to zoning, those issues were "settled and resolved." N.T. 8/4/04 at 209; R.R. at 209a. The municipalities were given 30 days to comment or reply to Permittee's response letter. No one from Exeter Township or Berks County responded or otherwise indicated that there was a potential conflict with local land use requirements or zoning ordinances. N.T. 8/4/04 at 240–241; R.R. at 240a–241a. Since the DEP did not receive any substantive comments concerning potential land use conflicts from the municipalities involved, the DEP assumed there were no conflicts and proceeded with the review process. N.T. 8/4/04 at 246–247; R.R. at 246a–247a. Had the municipalities submitted comments that indicated a potential land use conflict, Guerra would have reviewed the relevant zoning ordinance and comprehensive plan. N.T. 8/4/04 at 253; R.R. at 253a.

Donald E. Korzeniewski (Korzeniewski), an environmental protection specialist for the DEP, was the initial contact for Permittee's application. Korzeniewski conducted the administrative completeness review. He also assisted staff in the environmental assessment, and the "harms/benefits" analysis. Notes of Testimony, August 5, 2004, (N.T. 8/5/04) at 606–607; R.R. at 606a–607a. Korzeniewski identified Birdsboro Borough as the primary residential area in proximity to the Landfill. Although Birdsboro was too far away to be affected by odors or noise, it was affected by the visual impact of the Landfill. The aesthetic impact on Birdsboro residents was a major issue for the DEP, and one of the most important mitigations offered by Permittee was the overall reduction in the height of the landfill.

N.T. 8/5/04 at 629–630; R.R. at 629a–630a. According to Korzeniewski, a 15 foot increase in the height of the landfill was barely visible from Birdsboro which was two miles away and he believed that was offset by the benefit of the proximity impact fee to Birdsboro Borough. N.T. 8/5/04 at 638; R.R. at 638a. Because the DEP found property devaluation to be a potential harm, as opposed to a known harm, the DEP did not quantify or try to determine how much the real estate values would decrease as the result of the project. N.T. 8/5/04 at 635–637; R.R. at 635a–637a.

John Oren (Oren), a sanitary engineer for the DEP, performed the technical review of the engineering aspects of the application. Notes of Testimony, August 6, 2004 (N.T. 8/6/04) at 661; R.R. at 661a. Initially, Oren believed that the average daily volumes and maximum daily volumes and the lateral expansion of the landfill should be evaluated separately. He later changed his opinion after he observed their "interrelation" and combined them in his review. N.T. 8/6/04, at 665; R.R. at 665a.

Michael G. Maiolie (Maiolie) was the field operations supervisor in DEP's Waste Management Program, responsible for enforcing municipal residual and hazardous waste laws and regulations. Maiolie testified that from 1997 to 1999, the Landfill had numerous odor violations. After 2000, the odor violations decreased as a result of the improvement in landfill operations and implementation of other preventative measures. Notes of Testimony, August 26, 2004 (N.T. 8/26/04) at 1511–1514; R.R. at 1511a–1514a. Maiolie observed no litter problems and in the last three years, DEP received one noise complaint from back-up alarms. He did not recall receiving any complaints about truck traffic or dust. N.T. 8/26/04 at 1518–1520; R.R. at 1518a–1520a. Based on his personal knowledge and input from DEP inspectors, Maiolie testified that the Landfill's odor control program since 2001 was a "success." N.T. 8/26/04 at 1533; R.R. at 1533a.[7]

On March 31, 2005, the EHB issued a 60–page Order and Adjudication in which the appeal filed by Petitioner was dismissed.

 Petitioner timely filed a petition for review with this Court and raised essentially the same issues addressed by the EHB.[8] Specifically, Petitioner contends

---

7. Petitioner also presented the testimony of Crystal Newcomer (Newcomer), the primary drafter of the DEP's January 24, 2002, and March 27, 2002, "harms/benefits" analyses and an expert real estate appraiser, Richard Ready, PhD (Dr. Ready). Pasquale Mascaro (Mascaro), president and sole shareholder of the landfill, testified on behalf of Permittee. Mascaro described in detail the Landfill's improved state of the art gas management system and proposed odor control program. Douglas Haring (Haring), a licensed real estate broker and appraiser, also testified on behalf of the Landfill. In Haring's opinion, the expansion of the Landfill, would not impact the value or marketability of real estate. William Tafuto also testified. He was the civil engineer who prepared the visual impact report, also referred to as the "line-of-sight

analysis" which Permittee submitted to the DEP in support of its application.

8. When reviewing decisions of the EHB, this Court's scope of review is limited to determining whether constitutional rights were violated, whether an error of law was committed, or whether necessary findings of fact are not supported by substantial evidence. *Franklin Township Municipal Auth. v. Department of Environmental Protection*, 706 A.2d 393 (Pa. Cmwlth.1998). "Substantial evidence" is that which constitutes such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Gamble v. Workmen's Compensation Appeal Board (Burrell Construction & Supply Co.)*, 143 Pa. Cmwlth. 277, 598 A.2d 1071 (1991).

In EHB proceedings, the burden of proof is on the party asserting the affirmative of any

that the EHB erred when it affirmed because the DEP: (1) commenced its technical review before the completion of the "harms/benefits" analysis; (2) provided Permittee another chance to submit additional information in support of its application; (3) did not conduct the land use consistency review pursuant to Act 67/68; (4) did not properly analyze harms associated with property devaluation, odor and traffic in the context of the "harms/benefits" analysis; (5) improperly considered certain fees and additional waste services provided by the landfill operator to be benefits; and (6) improperly concluded that the benefits of the project clearly outweighed the harms.

### 1. *Timing of the Technical Review*

■ Petitioner first asserts that the EHB erred when it concluded that the DEP did not abuse its discretion when it conducted a portion of its technical review prior to concluding the harms/benefit analysis in contravention of 25 Pa.Code § 271.127(g) which provides in part that the Department "will evaluate the environmental assessment in Phase I of permit review or otherwise prior to technical review." Petitioner does not identify any particular harm that resulted from this alleged error, but maintains only that "there is no way to deconstruct the impact that the failure to follow the proper procedure had on the future conduct of the Department [DEP] review....We will never know what might have happened had the Department [DEP] followed its regulation." Petitioner's Brief, August 9, 2005, at 44.

This Court agrees with the DEP that Petitioner's assertion is based on a hyper-technical reading of the regulation which elevates form over substance and is pure speculation. Although the section states that the DEP will evaluate an environmental assessment prior to technical review, this does not mean that no aspect of technical review may be considered prior to the completion of the "harms/benefits" analysis. According to DEP's witnesses, various technical aspects of the Landfill, such as its design and construction, height and the proposed manner of gas collection, were reviewed as part of the "harms/benefits" analysis. N.T. 8/3/04 at 105; R.R. at 105a. As Benvin explained, "[t]here is always some amount of technical review that accompanies the "harms/benefits" analysis" and the DEP must be able to inquire into some of these technical considerations prior to commencing its technical review. N.T. 8/3/04 at 112; R.R. at 112a. Issues inherent in both the "harms/benefits" analysis and the technical review are sufficiently intermixed such that the two processes are incapable of being entirely separated. To require total separation would lead to redundancy.

According to DEP's regional facilities manager, Benvin, one of the reasons the "harms/benefits" analysis is done before the technical review is primarily to preserve the DEP's resources and manpower. If an application is denied because the benefits clearly do not outweigh the harms, then there is no need to proceed with the technical review. "It saves everybody a lot of time and money for not having to do the technical review." N.T. 8/3/04 at 113; R.R. at 113a. In addition, alterations may be made to the design of the landfill during the application process

issue. 25 Pa.Code § 1021.101. The party protesting issuance of a permit must come forward with evidence to show, on the record produced before the EHB, that issuance of the permit was arbitrary or amounted to an abuse of discretion. *Leatherwood, Inc. v. Commonwealth Department of Environmental Protection*, 819 A.2d 604 (Pa.Cmwlth.2003).

which could have ramifications on technical review. *Id.*[9]

"DE[P]'s interpretation of its regulations and regulatory scheme is entitled to deference and should not be disregarded unless shown to be clearly erroneous." *Birdsboro & Birdsboro Mun. Auth. v. Dep't of Environmental Protection,* 795 A.2d 444, 448 (Pa.Cmwlth.2002) (*quoting Hatchard v. Dep't of Environmental Resources,* 149 Pa.Cmwlth. 145, 612 A.2d 621, 624 (1992)). In this controversy, the DEP acknowledged that it considered some of the technical aspects of the Landfill before it concluded the "harms/benefits" analysis. The DEP was engaged principally in evaluation of the "harms/benefits" analysis, but was compelled to pursue aspects of the technical merits of the proposal in order to fully evaluate the harms and benefits. Once the "harms/benefits" analysis was completed and decided in March of 2002, the DEP completed the technical review and issued its final determination on May 30, 2002.

This Court agrees with the EHB's conclusion that the DEP's failure to complete the "harms/benefits" part of its analysis before turning to the technical review had no material effect on its grant of the permit application, and therefore there is no principled reason to vacate the permit

solely on the basis of the requirement of Code Section 127.127(g), 25 Pa.Code § 271.127(g) that the "harms/benefits" analysis be completed before the technical review is commenced. Assuming there was a procedural error during the processing of a permit application, it does not provide a basis for remand if it was harmless. In any event, Petitioner here has failed to demonstrate that there was a procedural error or that the alleged error had any adverse effect on Petitioner.

Accordingly, this Court finds that the EHB did not err when it refused to rescind the permit on this ground.[10]

## 2. *Permittee's Opportunity to Submit Additional Information*

■ Petitioner next contends that the DEP should not have allowed Permittee to submit additional information in support of its application after the DEP issued its January 24, 2002, letter which concluded, at that time, that the benefits of the project did not clearly outweigh the harms. According to Petitioner, this violated the regulations which provide that an application must be denied where the applicant fails to demonstrate that the benefits of the project clearly outweigh the harms. 25 Pa.Code 271.127. It is Petitioner's posi-

9. Although it is unclear to this Court how the DEP's strict adherence to the regulation could have changed the DEP's overall outcome in this case, Petitioner seems to suggest that the DEP's ultimate technical review failed to take into consideration the design changes that were proposed after the January 24, 2002, review, namely the reduction in the height of the Landfill. However, there is nothing in the DEP's final analysis or in the record which suggests that the DEP committed any error when it ultimately considered the technical aspects of the application or that it failed to consider the reduction of the height of the Landfill in its final technical review.

10. Petitioner also asserts for the first time that the DEP erred when it combined the "harms/benefits" analysis for the *expansion* (height and width) with the "harms/benefits" analysis for the *tonnage increases* (maximum daily volume and average daily volume) even though it recognized that each proposal involved different harms and benefits. Petitioner failed to raise this issue before the EHB, therefore, it is waived. *McDonald Land & Mining Co. v. Department of Environmental Resources,* 664 A.2d 194 (Pa.Cmwlth.1995). In any event, no provision of the regulations imposes a requirement that the DEP consider the expansion of the footprint of the landfill separately from the proposed increase in tonnage.

tion that this procedure was not authorized by the regulation. This Court does not agree.

There is no rule or mandatory requirement in the DEP's regulation which precluded the DEP from offering the Permittee the opportunity to submit additional information to address a specific concern or address an issue that was raised during the review process. The record demonstrates that the whole permit process involved a huge exchange of information. Once the DEP reviewed all of the issues in the "harms/benefits" analysis it became clear that questions remained, particularly regarding the height of the landfill and the impacts on nearby Birdsboro Borough. As described at the hearing, the DEP did not view it as fair or proper to deny the entire application based on concerns the DEP only identified after it began drafting its "harms/benefits" analysis. Fairness required expending an opportunity to Permittee to respond. This Court finds that there was nothing improper in the DEP's course of action and agrees with the EHB's conclusion that the DEP must be afforded the requisite flexibility to fully evaluate all aspects of a proposal and to seek additional information as it reasonably sees fit to conduct a full and proper review.

The EHB neither misapplied the law nor abused its discretion when it declined to rescind the permit on these procedural grounds.

### 3. *The DEP's Act 67/68 Review*

In its next issue, Petitioner asserts that the DEP abused its discretion when it granted the application for a major modification without conducting the "proper" Act 67/68 review. Petitioner contends that the DEP's Act 67/68 review was unsatisfactory because the DEP did not review, "or even ask for", the pertinent zoning ordinances or comprehensive plans, or review the zoning litigation involving Permittee as a party and the DEP failed to assess the legality of the Host Community Agreement with Exeter Township. Petitioner argues that because of these failures DEP abused its discretion when it approved the application for a major modification. Again, this Court does not agree.

The DEP's "Interim Policy for Consideration of Local Comprehensive Plans and Zoning Ordinances in DEP Review of Permits for Facilities and Infrastructure", like Act 67/68, directs the DEP to consider comprehensive planning and zoning ordinances in its decision making process on permit applications. The testimony of the DEP witnesses, credited by the DEP and EHB, established that the DEP did, in fact, "consider" all that was required, that landfilling was not a permitted use in a light industrial district and that there was a potential conflict between the proposed expansion and the zoning ordinance. While the DEP may not have conducted a comprehensive page-by-page review of the Exeter Township zoning ordinance and relevant comprehensive plans, or the pleadings in the litigation materials, the DEP acquired, by other means, the necessary information that a review of these materials would have revealed.[11]

According to the undisputed evidence, the DEP was aware early on in the application process by virtue of a letter sent by Exeter Township's legal counsel, Charles Zaleski that the Landfill was situated within a light industrial zoning district. In accordance with DEP's interim policy doc-

---

11. By Petitioner's own admission, the DEP "was aware ... of potential conflicts between [Petitioner's] application and zoning in Exeter Township." Petitioner's Brief, August 9, 2005, at 50.

ument, in effect at the time, Permittee submitted its response to the DEP's land use questionnaire which referenced the zoning dispute and attached the October 30, 2000, Host Community Agreement. Permittee represented that "to the extent there may have been any issues relating to zoning, *those issues were settled and resolved* pursuant to the Host Community Agreement between Exeter Township Board of Supervisors at a public meeting on October 30, 2000." Letter from Pioneer Crossing Landfill to Pa. DEP, November 10, 2000, at 4; R.R. at 2341a (Emphasis added). Permittee's response was sent to Exeter Township and Berks County. Because neither responded, the DEP concluded that whatever difficulty existed between the Landfill and the Township was resolved by the Host Agreement and there were no ongoing substantive land use conflicts that required a denial of the expansion application.

The purpose of the Act 67/68 review in this case was to "avoid conflicts" between local land use and permits issued by the DEP. In light of the DEP's obvious awareness and consideration of the potential conflict and its satisfaction that all issues were resolved, this Court fails to comprehend how a reading of the zoning ordinance, comprehensive plans and litigation materials would have changed the DEP's Act 67/68 analysis.

Petitioner nevertheless maintains that the Host Agreement was "illegal contract zoning" and the DEP should have assessed the "legality" of the Host Agreement before relying on it. This Court does not agree. Act 67/68 does not require the DEP to conduct its own independent legal analysis of a settlement agreement and Petitioner points to no other statutory or regulatory provision which required a more comprehensive review than what occurred. As Guerra testified, it was the DEP's policy to rely on comments from local municipalities and to defer to local governments in land use decisions. Permittee indicated in no uncertain terms that any issues relating to zoning were settled and resolved pursuant to the Host Community Agreement. The County's and Township's silence inferred their consent. The DEP had no reason to inquire further.

It is not for this Court to determine in this appeal whether the Host Community Agreement amounted to illegal contract zoning. The Court of Common Pleas has exclusive jurisdiction of land use appeals under the MPC and the DEP, the EHB and this Court may not intrude upon that jurisdiction. Sections 1001–A and 1002–A of the MPC, 53 P.S. § 11001–A and § 11002–A.

The DEP acted in accordance with its discretion when it determined that Permittee satisfied the regulatory review criteria. The EHB found the DEP reasonably concluded that there were no credible reasons to deny the permit application solely on zoning or land use issues. Because the record amply supports this conclusion, this Court finds no error.

### 4. *Harms Associated with Property Devaluation, Odor and Traffic*

Petitioner next asserts the DEP improperly performed the "harms/benefits" analysis because it failed to properly analyze harms associated with (1) property devaluation, (2) odor and (3) traffic.

#### a. *The Harms/Benefits Analysis*

Section 271.127 of the DEP regulations, 25 Pa.Code § 271.127, sets forth the "harms/benefits" test required under Pennsylvania law:

Each environmental assessment in a permit application shall include at a minimum a detailed analysis of the potential impact of the proposed facility on the

environment, public health and public safety, including traffic, aesthetics, air quality, water quality, stream flow, fish and wildlife, plants, aquatic habitat, threatened or endangered species, water uses, land use and municipal waste plans. The application shall consider features such as scenic rivers, recreational river corridors, local parks, State and Federal forests and parks, the Appalachian Trail, historic and archaeological sites, National wildlife refuges, State natural areas, National landmarks, farmland, wetland, special protection watersheds designated under Chapter 93 (relating to water quality standards), airports, public water supplies and other features deemed appropriate by the Department or the applicant. The permit application shall also include all correspondence received by the applicant from any State or Federal agency contacted as part of the environmental assessment.

25 Pa.Code § 271.127(a).

Further, Code Section 271.127 provides: The environmental assessment shall describe the known and potential environmental harms of the proposed project. The applicant shall provide the Department with a written mitigation plan which explains how the applicant plans to mitigate each known or potential environmental harm identified and which describes any known and potential environmental harms not mitigated. The Department will review the assessment and mitigation plans to determine whether there are additional harms and whether all known and potential environmental harms will be mitigated. In conducting its review, the Department will evaluate each mitigation measure and will collectively review mitigation measures to ensure that individually and collectively they adequately protect the environment and the public health, safety and welfare.

If the application is for the proposed operation of a municipal landfill, construction/demolition waste landfill or resource recovery facility, the applicant shall demonstrate that the benefits of the project to the public clearly outweigh the known and potential environmental harms. In making this demonstration, the applicant shall consider harms and mitigation measures described in subsection (b). The applicant shall describe in detail the benefits relied upon. The benefits of the project shall consist of social and economic benefits that remain after taking into consideration the known and potential social and economic harms of the project and shall also consist of the environmental benefits of the project if any.

25 Pa.Code § 271.127(a).

As Petitioner points out, the applicant and the DEP are required to assess all harms associated with the major modification. 25 Pa.Code § 271.127. Thereafter, harms must be mitigated and if total mitigation is not achieved, then the harm remains and is balanced against any benefits of the project to the public. Benefits and harms are identified as "known" or "potential." A "known" harm or benefit is one that the DEP feels certain will occur in the future. A "potential" harm or benefit is one that might or might not occur depending on the circumstances. DEP Harms/Benefit Analysis, March 27, 2002, at 2; R.R. at 2442a.

The duration, frequency and intensity of the benefits and the harms were evaluated by the DEP. The DEP explained in its Harms/Benefits Analysis that "duration" refers to how long a harm or benefit continues. "Frequency" refers to how often it will occur, and "intensity" refers to how much the harm or benefit will be if or

when it will occur. DEP Harms/Benefit Analysis, March 27, 2002, at 2; R.R. at 2442a.

In the present controversy, the DEP ultimately accepted twenty-three social, economic and environmental benefits associated with the Landfill's expansion project.[12] These benefits included: (1) pre-paid statutory host municipality benefit fees payable to Exeter Township in the amount of $1.50/ton for the first five years, $1.75/ton for the second five years, $2.00/ton the third five years, and $2.25/ton the fourth and five years; (2) a proximity impact fee payable quarterly to Birdsboro Borough in the amount of $1.00/ton for the first five years, $1.10/ton for the second five years, $1.20/ton for the third five years and $1.30/ton for the remaining years; (3) a statutory recycling fee in the amount of $2.00/ton paid into the Recycling Fund for as long as the Landfill accepts waste; (4) a statutory Environmental Stewardship fee in the amount of $0.25/ton payable to the Commonwealth for as long as the Landfill accepts waste; (5) purchase of local and regional goods in excess of $3 million/year; (6) a contribution of 2 acres of land and $275,000 to the First Baptist Church (Permittee had to purchase this property to expand the Landfill); (7) presentations by Landfill staff to school students and on-site tours to students; (8) free disposal of "white goods" for Exeter Township residents; (9) free township-wide spring clean-up for Exeter Township residents and free waste collection for the residents of Exeter Township; (10) property tax revenues the Landfill pays to Berks County and the local school district; (11) a 58–acre recreational park to be developed on the site after the Landfill closes; (12) free disposal for spring and fall clean-up for Birdsboro Borough residents; (13) free disposal of "white goods" for Birdsboro Borough residents; (14) free disposal for spring and fall clean-up for Robeson & Union Townships; (15) free disposal of white goods for Robeson and Union Township residents; (16) environmental clean-up of the prior uncontrolled trash dump located underneath the Eddie Smith Mobile Home Park which is adjacent to the Landfill, and environmental clean-up of the ash buried in the back of the First Baptist Church property located to the southeast of the Landfill; (17) a minimum of $50,000 per year in charitable contributions to local civic, social, athletic, educational, religious and community groups [13], (18) on-site recycling drop-off center, (19) recycling drop-off stations for Birdsboro Borough, Robeson and Union Township residents; (20) restoration and enhancement of 1250 feet of an unnamed tributary to the Schuylkill River; (21) construction and operation of a 6 megawatt power station for the recovery and beneficial use of landfill gas; (22) forty-seven full-time employment positions; and (23) income and sales taxes to the Commonwealth from Landfill employees. The DEP considered these benefits "known" benefits.

The DEP also identified seven potential environmental, social and economic harms including: property devaluation, increased truck traffic, increased odors, aesthetic impacts, noise from back-up alarms, increased litter from the landfill itself and from the trucks, and discharge of landfill gas into the atmosphere.

12. The DEP ultimately rejected nine other benefits as "not directly related" to the permit modification request.

13. The DEP noted that the "lack of specificity reduces the weight of this benefit." DEP Harms/Benefits Analysis, March 27, 2002, at 11; R.R. at 2451a.

In mitigation of these seven social, economic and environmental harms, the DEP considered, among other things, Permittee's litter control program, extensive odor control programs, noise reduction measures, traffic control programs, the reduction of the proposed height of the Landfill so as to markedly reduce the visual impact of the Landfill particularly on Birdsboro Borough and the potential reduction of property values.

In its final balancing analysis, the DEP concluded that the potential social and economic harm of property devaluation was offset by the known social and economic benefits of the project. The DEP then, as it was required to do, weighed the potential environmental harms against the known social, economic and environmental benefits together with the mitigations proposed by Permittee. The DEP concluded:

> Pioneer Crossing Landfill has demonstrated that collectively, the benefits associated with the expansion and increase in average and maximum daily volumes clearly outweigh the harms associated with the modification. The magnitude of the environmental and SE [social/economic] benefits clearly outweighs the potential litter harm, the small known traffic harm, the collective harms from aesthetics and odors, and the short duration landfill gas emission harm.

DEP Harms/Benefit Analysis, March 27, 2002, at 16; R.R. at 2456a.

b. *Property Devaluation*

■ First, Petitioner contends that the DEP failed to properly analyze harms associated with property devaluation. Petitioner asserts that the DEP was required to "quantify" the number of homes around the Landfill and assess a specific dollar amount of the property devaluation associated with the expansion in order to "properly" perform its analysis. According to Petitioner, had the DEP done this, it would have fully appreciated the magnitude of the harm and reached a different conclusion.

According to Petitioner's property valuation expert, Richard Ready, Ph.D. (Dr. Ready), there were 3,400 homes located within 3,200 meters of the Landfill and the total impact of the major modification to property values and lost tax revenues in the area exceeded $41 million. Petitioner contends that the value of the associated benefits, i.e., the clean-ups, free disposal of "white goods" and recycling centers, was worth far less than the $41 million property devaluation and property tax losses associated with the expansion.[14]

The issue, then, is whether the DEP was required, as Dr. Ready did, to quantify or place a dollar figure on the potential property devaluation in order to properly balance it against the project's benefits.

As the EHB pointed out, the primary residential area in proximity to the Landfill was Birdsboro Borough. Birdsboro Borough was only visually affected by the Landfill. In other words, the residents were able to see the Landfill, but it was too far away to experience odors or noise. The DEP also considered the fact that the Landfill entered into agreements to pur-

---

**14.** The EHB rejected Dr. Ready's testimony as not convincing, unreliable and unrealistic noting that Dr. Ready lacked experience in various aspects of real estate appraisal and sales. He relied upon old, unverified data, and his analysis *did not* accurately predict actual home sales. Moreover, the EHB simply rejected Dr. Ready's opinion which was based on the counterintuitive assumption that the existing Landfill would have no adverse impact on real estate values, but the devaluation of surrounding real estate would be caused solely by the *expansion* of the Landfill. This Court will not reweigh the EHB's credibility determinations. *Leatherwood.*

chase those homes along South Baumstown Road that were relatively close to the Landfill and the most likely victims of real estate devaluation. It also considered that the Landfill owned significant buffer properties and homes around the Landfill and that mostly industrial lands existed to the north and west of the Landfill. Based on these circumstances, and because no one submitted any information to the DEP that their property would be devalued because of proximity to the Landfill, the DEP did not consider property devaluation a "significant" harm and did not deem it necessary to focus on the specific value of each home.

The EHB concluded that this interpretation of the DEP's duty was both reasonable and appropriate:

> Many social benefits and harms, particularly quality of life concerns are simply too intangible to quantify in dollar amounts in a reasonable way. Some benefits of the project, such as payments of taxes and payments to be made to the affected communities were easily expressed in dollar amounts. A monetary analysis of other benefits might be possible, but the conduct of such an analysis may be unnecessarily expensive and time consuming when the Department's [DEP] reasonable judgment would be adequate to make the necessary comparison. Many people have made the judgment that curbside pickup of trash has more benefits than harms without analyzing the dollar-for-dollar costs of truck emissions and noise or the inconvenience of personal delivery of trash to a landfill or incinerator. The Department [DEP] certainly has discretion to make similar judgments in balancing all of the benefits and harms of the project whether quantified in dollar terms or not.

EHB Opinion, 3/31/05, at 44.

This Court agrees with the EHB that the DEP's decision not to put a dollar value on the projected decrease in property values and the consequent reduction in property taxes was reasonable and appropriate.

First, the regulations do not require the DEP to quantify harms and benefits in dollar amounts because the public-interest of balancing environmental and economic impacts is speculative and not conducive to dollar-for-dollar quantification or mathematical precision. Rather, the DEP was required to balance the favorable and adverse effects of the major modification, and this Court agrees with the EHB that DEP did so.

While our research reveals no Pennsylvania cases interpreting how the DEP must analyze the issue of property devaluation, this Court's interpretation is consistent with federal case law. In *Town of Norfolk v. United States Environmental Protection Agency*, 761 F.Supp. 867 (D.Mass.1991), several Massachusetts towns challenged the adequacy of the Environmental Protection Agency's (EPA) supplemental environmental impact statement for a sewage residuals landfill. One of the issues raised was the EPA's failure to put a dollar value on the probable decrease in property value as a result of the location of the landfill or dollar value on the consequent reduction in property taxes. The district court concluded that the EPA's failure to conduct its own study and quantify the economic harms (referring to the effect on local property values and tax revenues) was not unreasonable and did not result in a failure by the EPA to adequately address the socio-economic impacts of the landfill site.

> [T]he [EPA] provides a lengthy, in-depth discussion of the property-value effects on the Walpole area.... [The] EPA surveyed existing studies of property value impacts of sanitary landfills,

power plants, airports, and highways, applying these results to the proposed landfill. Without providing dollar figures, the [EPA] notes some negative impacts on property values. It concludes that there will be reductions in values to nearby properties because of the noise level and unsightliness of the facility.... It further notes that one study of sanitary landfills showed 'distinctly negative impacts' in land values.... It distinguishes this study, however, on the basis of three specific differences between the operating conditions of the two types of landfills, concluding that 'the residuals landfill should not generate as significant property value impacts as those described in the literature for sanitary landfills.' ... The discussion ... together with the detailed response to comments ... indicates that EPA adequately took socio-economic effects into account.

*Town of Norfolk*, 761 F.Supp. at 887.

Here, the evidence similarly demonstrated that the DEP adequately took socio-economic effects into account. The DEP concluded that property devaluation was indeed a potential social and economic harm. The DEP acknowledged the widespread belief among local residents that property values were not as high as they would be if there was no Landfill. The DEP recognized that the perception of decreased property values may lead purchasers to pay less for property. It noted however that property devaluation is difficult to prove because of the many factors that affect the value of a property, perception being one of those factors. In balancing the harms against the benefits, the DEP considered that the Permittee instituted a Property Value Protection program designed to purchase properties along South Baumstown Road at the assessed price as if the Landfill did not exist. The DEP concluded that the potential so-cial and economic harm of property devaluation was offset by the social and economic benefits. This Court agrees that nothing more was required.

c. *Traffic*

Petitioner next contends that the DEP's assessment of harm caused by trash trucks was too limited because it only considered the "haul routes." It asserts that the DEP failed to meaningfully assess traffic harms on "roads other than the short stretch from U.S. 422 and Pa. 82." Petitioner's Brief, August 9, 2005, at 58.

A review of the record belies Petitioner's claim. Newcomer and others testified that during the public comment period citizens raised concerns about Landfill trucks using other local roads in Exeter Township, including a narrow bridge on Tulpehocken Road and the Road to Daniel Boone Homestead, a large historic site. N.T. 8/24/04 at 1639–1641; R.R. at 1639a–1641a. In addition, the DEP considered that the Landfill put in place "written approval route guidelines" for its truck drivers and levied sanctions against drivers who did not follow those designated routes. N.T. 8/26/04 at 1615, 1629; R.R. at 1615a, 1629a. The DEP also considered that the Host Community Agreement included a provision that Landfill trucks would not use Township roads but would restrict travel to state highway routes and interstate highways. Accordingly, the DEP concluded that the harm created by truck traffic was significantly mitigated. As the EHB observed, Petitioner failed to point to any other factors that the DEP should have considered and it failed to produce any evidence that the mitigation measures were illusory or ineffective.

The EHB did not err when it concluded that Petitioner failed in its burden of proving that the DEP did not properly consid-

er traffic impacts in its "harms/benefits" analysis.

#### d. *Odors*

Next, Petitioner asserts that odors remained a significant problem at the Landfill and were likely to continue because of the Landfill's history of violations and compliance issues. Petitioner argues that the EHB abused its discretion when it found no error in the DEP's consideration that odors were mitigated by Permittee's proposed odor control program. Again, this Court does not agree.

The EHB was well aware of the Landfill's unacceptable odor problem in the past, having adjudicated the DEP's assessment of a civil penalty related to those violations. The EHB noted that Benvin and other DEP witnesses explained in great detail that they considered the Landfill's compliance history. A review of the record establishes that the DEP questioned Permittee extensively concerning the adequacy of its proposed odor control measures, and Permittee responded in a manner which satisfied DEP that the Landfill would continue to comply environmentally and that the odor problem that existed at the Landfill in the late 1990's was rectified.

David Brown (Brown), the Landfill's Director of Engineering, acknowledged the Landfill had in the past experienced significant problems associated with "capping" and its "gas management system." Notes of Testimony, August 13, 2004, (N.T. 8/13/04) at 1312, R.R. at 1312a. He explained that since that time, the odor situation improved, and the notices of violation dramatically decreased. Very few occurred in early 2001 and none were issued since. Brown explained that measures to decrease odor included eliminating sludge customers with odorous loads, spraying the working face with a sodium hypocholorite solution, and constant monitoring.

The Landfill's owner, Mascaro, also testified that the Landfill created a Compliance Department to monitor the Landfill's adherence to odor and other regulations. Notes of Testimony, August 12, 2004, (N.T. 8/12/04) at 1015; R.R. at 1–15a. He believed the Landfill's new gas management system was "first-class" and its working face techniques "excellent." Because the Landfill employs the "most sophisticated" compaction equipment the working face is kept "very tight" and "very small." There is also a "very effective" chlorination system at the Landfill. N.T. 8/12/04 at 1013–1014; R.R. at 1013a–1014a.

Significantly, the DEP's Waste Management Field Operations Supervisor, Maiolie, testified that the DEP was satisfied with the Landfill's odor control program and considered it to be a success.

In contrast, Petitioner presented no credible evidence to challenge the effectiveness of the Landfill's odor control plan other than a few complaints from persons living immediately adjacent to the Landfill. No evidence was presented which established that odor problems were widespread or that the Landfill's odor control program was not well designed or ineffectual. Instead, Petitioner attempted to convince the DEP and the EHB that odors will likely continue into the future due to the Landfill's history of past violations and the fact that management had not changed. Based upon its independent consideration of the evidence, however, the EHB agreed with the DEP's conclusion that odors, as a potential harm, were mitigated by the Landfill's comprehensive odor control program. This conclusion was based on a combination of factors, including the resolution of the capping problem, the installation of an improved gas management system and the improvement of operational practices, to-

gether with a change in the overall culture of the Landfill operation, with an emphasis on the importance of compliance.

Because the EHB's findings of fact were fully supported by the record this Court discerns no error.

### 5. Benefits—Act 101 and other Fees and Waste Services

Petitioner next asserts that the payment of the host municipal benefit fees, recycling fees (Act 101 fees), and services such as on-site recycling drop-off, were not, in reality, significant benefits to the local community and were erroneously classified as benefits by the DEP and the EHB.

#### a. Act 101 Recycling Fees

█ The first benefit challenged by Petitioner is the payment of recycling fees. Section 701 of Act 101 requires all municipal waste landfills to pay a $2 recycling fee per ton for all solid waste processed at the municipal landfill. Section 701 of Act 101 contains a "sunset provision" which provides that "no fee shall be imposed under this section on and after January 1, 2009." 53 P.S. § 4000.701. Recycling fees are paid into the Commonwealth's Recycling Fund and are allocated by the DEP in accordance with the provisions of Section 706 of Act 101, 53 P.S. § 4000.706. Seventy percent of recycling fees are expended for the development and implementation of recycling and waste reduction programs.

Petitioner contends that the "sunset provision" of Section 701 of Act 101 rendered the benefit meritless and speculative. Petitioner further contends that recycling fees should not be considered a "benefit" because all fees are not applied locally, they are *mandated* by law rather than voluntary, and they are a "cost of doing business" because they are passed onto Landfill's customers. This Court, like the EHB is unpersuaded by these arguments.

The EHB found that recycling fees were a benefit despite the "sunset clause" because Permittee "agreed" to pay such fees for the life of the expansion permit (i.e., past the expiration date of the statute) "as a condition of the permit" and because the EHB had no doubt that the Landfill would continue to operate beyond 2009. In other words, the EHB, in essence, concluded that although the legislature may not, at some time in the future, require Permittee to pay the recycling fees, Permittee would nevertheless be obligated to pay the fees by virtue of its promise to pay as a condition of obtaining the permit. The question is whether, notwithstanding the language of Section 701 of Act 101, there was any basis to require Permittee to pay recycling fees to the DEP after January 1, 2009? And if not, should the recycling fee nevertheless be deemed a "benefit" in the "harms/benefits" analysis?

As a preliminary matter, this Court disagrees with the EHB's conclusion that there was an independent basis to impose a recycling fee on Permittee beyond January 1, 2009. The EHB concluded that, despite the sunset clause, Permittee was obligated as a condition of the permit to pay the recycling fee beyond the sunset date. However, this would defeat the purpose of the sunset clause and the legislature's clear intention that the recycling fees be temporary. Further, the DEP would have no authority to accept recycling fees from Permittee after the statute's end date.[15] Therefore, the benefit of the recycling fees is indeed provisional since there is no guarantee that fees will continue to be collected after the expiration date and if so, there is no way to

---

**15.** Of course, if the legislation is reenacted after January 1, 2009, Permittee would be required to comply with any renewed provisions.

determine at this juncture what the amount of the fee will be.

However, this neither renders the benefit of the recycling fees illusory nor does it mean the DEP was compelled to disregard them in its "harms/benefits" analysis. The expansion, by adding several hundred tons of waste, will generate $2 per ton to the Recycling Fund, not to mention the interest generated thereon through January 2009. The funds are earmarked for the development and implementation of Pennsylvania's recycling programs which undoubtedly results in a benefit to the entire Commonwealth.

Nevertheless, Petitioner also maintains that recycling fees should not have been considered a benefit because some of those funds will be applied to statewide projects rather than directly to those communities negatively affected by the expansion. This argument ignores the overriding goals of the SWMA and Act 101 which are "to establish a comprehensive state and local solid waste management program, involving permits for disposal facilities, which would provide the necessary disposal facilities *and also protect the environment and the public from improper and inadequate solid waste practices while encouraging conservation and recycling." Eagle Environmental II, L.P., v. Commonwealth of Pennsylvania Department of Environmental Protection,* 584 Pa. 494, 509–11, 884 A.2d 867, 877 (2005) (Emphasis added). Although it may be that all who live in the Commonwealth derive some overall environmental benefits from the recycling program, that does not detract from the fact that the local municipalities, including Berks County, stand to gain from programs designed and developed to control, recycle and reduce waste. Moreover, the regulations do not, in any way, restrict the DEP's consideration to only those benefits flowing directly to the communities affect-

ed by the expansion. To the contrary, subsection (c) of the regulations, 25 Pa. Code 271.127(c), allows the DEP to assess all of the potential negative, and positive, economic and social implications *"of the project."* Because the Act 101 recycling fee is clearly an economic benefit "of the project," the DEP and EHB did not err in considering it in the "harms/benefits" analysis.

With regard to Petitioner's remaining contentions, that the Act 101 recycling fee should not be considered a benefit because it was mandated by law and because it was passed onto the Landfill's customers, this Court summarily rejects these arguments as well. Besides repeating its generalized allegations of error, Petitioner makes no pertinent legal argument or analysis to support its contentions. Moreover, as the EHB correctly pointed out, there was absolutely no requirement that a benefit be strictly voluntary in order to be weighed as a benefit or that it was less a benefit because the operator passed some of the expense to its customers.

Accordingly, this Court finds no error in either the DEP's treatment of Act 101 recycling fees or the EHB's subsequent order upholding that treatment.

b. *Act 101—Proximity Impact Fee*

■ Petitioner also takes the position that the "proximity impact fee" to Birdsboro Borough was improperly considered a benefit because it is unenforceable and because it does not adequately offset the harms caused by the expansion. Again, this Court disagrees.

Permittee agreed to pay a proximity fee to Birdsboro Borough to offset the impact based on its proximity to the Landfill expansion. The impact fee equaled $1.00 per ton in the first five years of the operation of the expansion and increased by $0.10 per ton every five years thereafter. Per-

mittee projected the dollar amount to be paid to Birdsboro Borough to be in excess of $11,000,000. Like the host municipality benefit fee to Exeter Township the "proximity impact fee" was enforceable throughout the life of the expansion as a condition of the permit. It was for the DEP and the EHB to determine whether the impact fee adequately offset any loss in tax revenue from the alleged property devaluation and other harms in its final "harms/benefits" analysis. This Court discerns no error in the DEP's or EHB's assessment of the proximity fee as a benefit. Petitioner's contention that it was not properly evaluated is entirely without basis and totally speculative.

### c. Clean–Ups and Waste Services

██ Petitioner argues that the additional clean-up and waste services offered to municipalities surrounding the Landfill were improperly considered by the DEP and EHB because the benefit was neither quantified in a dollar amount nor enforceable by contract. As with the "impact fee" to Birdsboro Borough, the lack of a contract between the Landfill and the municipalities was immaterial because the provision of the services was enforceable by the DEP through the permit. Further, as discussed *supra*, there was no requirement that all of the benefits or harms of the project be quantified in a dollar amount.

Accordingly, this Court finds no basis for finding error in the EHB's conclusion that DEP's assessment of this benefit was proper.

### 6. *Eagle Environmental II*

██ Finally, Petitioner contends that the DEP and EHB did not apply the "harms/benefits" regulation properly.[16] Citing our Supreme Court's decision in

*Eagle Environmental II*, Petitioner identifies sixteen benefits the DEP and EHB should have rejected because they do not "flow directly" from or bear "any sort of direct relationship" to the expansion of the Landfill: (1) Proximity Impact Fee to Birdsboro Borough; (2) Contribution to the First Baptist Church; (3) Presentations to Schools and Tours for Students; (4) Charitable Contributions; (5) Free Township wide Spring Cleanup for Exeter Township; (6) Free Disposal of "White Goods" for Exeter Township Residents; (7) Ida Mascaro Recreational Park; (8) Free Disposal for Spring and Fall Cleanup for Birdsboro Borough residents; (9) Free Disposal of "White Goods" for Birdsboro Borough Residents; (10) Free Disposal for Spring and Fall Cleanup for Robeson & Union Township Residents; (11) Free Disposal of "White Goods" for Robeson & Union Township Residents; (12) On–Site Recycling Drop-off; (13) Eddie Smith and First Baptist Church Cleanup; (14) Recycling Drop Offs for Birdsboro Borough, Robeson Township & Union Township; (15) Stream Restoration and Enhancement of 1250 Feet of Tributary to Schuylkill River; (16) Recovery and Beneficial Use of Landfill Gas. *See* Supplemental Brief of Petitioner at 6–7.

According to Petitioner, *Eagle Environmental II* is critical to the outcome of this appeal because it provides new guidance, not previously available, on how the "harms/benefit" analysis must be applied. Petitioner claims since *Eagle Environmental II* was decided on October 27, 2005, it did not have the opportunity before the EHB to dispute these sixteen proposed benefits on the ground that they were unrelated to the project. This Court, however, is not convinced that the issue could not have been raised before now.

---

**16.** On February 1, 2006, this Court granted Petitioner's Petition for Leave to file a Supplemental Brief addressing the applicability of *Eagle Environmental II*.

*Eagle Environmental II* upheld the facial constitutionality of the "harms/benefits" analysis and the authority of the Environmental Quality Board (EQB) to promulgate the "harms/benefits" regulation. Petitioners do not dispute that the fundamental holding of *Eagle Environmental II* is inapplicable to this case as neither the constitutionality of the "harms/benefit" nor the EQB's rulemaking authority were challenged here. Rather, the portion of the opinion upon which Petitioner relies is found in footnote 11 where our Supreme Court addressed a concern raised by the dissent that the "harms/benefits" regulations effectively allow an applicant to "buy a permit." *Eagle Environmental, II*, 584 Pa. at 528–29, 884 A.2d at 888. The majority disagreed that the regulations should be declared invalid particularly in light of the fact that the language specifically requires the DEP to consider only benefits "of the project" and *"facially, does not contemplate the incorporation of unrelated benefits in the "Harms/Benefits" analysis."* *Eagle Environmental, II*, 584 Pa. at 508, fn. 11, 884 A.2d at 876, fn. 11. (Emphasis added). In other words, the Supreme Court merely stated the obvious. Thus, contrary to Petitioner's contention, *Eagle Environmental II* did not decide anything novel or shed new light on the nature of the benefits to be weighed in the "harms/benefits" analysis. Consequently, *Eagle Environmental II* does not provide Petitioner with any basis upon which to dispute the legitimacy of the benefits at issue. The regulations were in effect and it was clear that only benefits "of the project" were to be considered. 25 Pa.Code § 271.127(c). The

DEP complied with the regulations as evidenced by both its preliminary and final analyses when it *specifically* rejected a number of benefits on the ground that they were *not sufficiently related to the expansion project.* Petitioner had every opportunity before the EHB to challenge this determination by contending that the DEP should have rejected these sixteen additional benefits on the same ground, i.e., because they were allegedly unrelated to the expansion project. Petitioner failed to do so, and the EHB was consequently denied the opportunity to review the issue. Therefore, the issue was waived.

Assuming *arguendo*, that Petitioner did not waive the issue, this Court does not agree that the decision of whether a benefit was sufficiently related to the project to be considered to be an economic or social benefit can be made summarily as Petitioner suggests. With the exception of contributions to local civic, social, athletic, educational, religious and community groups,[17] which are unmistakably unrelated to the expansion, this Court is unwilling to declare, without further analysis or support in the record, that the fifteen other benefits challenged by Petitioner are equally unrelated. Petitioner has provided no analysis or argument to support its claim that the enumerated benefits were unrelated to the project.

Moreover, *Eagle Environmental II* does not advance Petitioner's position. There, the applicant identified a number of benefits flowing from the project in its landfill permit application including: disposal of debris in the event of a disaster, payments for health and safety training courses for

---

**17.** As noted above, the DEP did not attach much weight to this proposed benefit because it was speculative. In light of that and the other substantial economic benefits accepted by the DEP, this Court does not believe the DEP's consideration of a relatively minimal charitable contribution tainted the DEP's final balancing analysis to the point that rescission of the permit is warranted.

landfill operators and the use of coal excavated from the site. Real long-term benefits included replacement of wetland acreage, improvement of roads leading to the landfill, benefits to wetlands and reduction of erosion from runoff. Real short-term benefits included jobs for local residents at the landfill, increased business associated with or located near the landfill, payment of additional local, state and federal income taxes as the result of increased employment, higher real estate taxes, a $2/ton "host fee" to the township and provision of a recycling drop-off center. Our Supreme Court observed that "in contrast to the specter of companies buying permits ... *the facts of the cases before the Court involve consideration of benefits that are 'directly related to the proposed project.'* " *Eagle Environmental, II,* 584 Pa. at 508, fn. 11, 884 A.2d at 876, fn. 11. (Emphasis added). Here, the DEP considered similar environmental, economic and social factors, i.e., the recycling drop-off centers, the ultimate restoration of the site into a 58–acre recreational park, and the recapture and beneficial use of landfill gas, to be benefits "of the project."

 As for the impact fees to Birdsboro Borough, this Court does not agree that those fees, which represent an economic benefit to Birdsboro Borough, are unrelated to the landfill's expansion. Petitioner does not challenge the "host fee" as unrelated. However, the Birdsboro Borough impact fee, like the "host fee" (which the legislature refers to as a *"benefit* fee" in Act 101, 53 P.S. §§ 4000.102(b)(7), 4000.1301), offset what the DEP deemed to be a potential aesthetically negative impact caused by the increased height of the Landfill and was directly correlated to and calculated on the Landfill's yearly tonnages. With respect to the free waste services and clean-ups offered to the local affected municipalities, without the Landfill's existence, such free services would not exist. Giving unconditional preference to the waste generated within the affected communities was appropriately considered as an economic and environmental benefit of the project.

 Finally, with respect to the clean-up and restoration of the unnamed tributary to the Schuylkill River and the uncontrolled dumps, this Court, like the EHB, does not conclude that the DEP erred when it considered these as environmental benefits worthy of consideration. Although these environmental benefits are not necessarily directly related to the Landfill's expansion operations, the Landfill's continued existence through the expansion permit, made these significant and environmentally beneficial clean-ups possible. There is, therefore, a coherent connection between the continuation of the Landfill and the cleanups to deem the cleanups a benefit of the project.

Petitioner's argument that these benefits are "unrelated" stems from its concern, gleaned from the dissent in *Eagle Environmental II,* that the DEP has somehow compromised the protection of the environment based on what it perceives to be a general benefit to the public at large. While the dissent in *Eagle Environmental II,* cautioned against allowing permit applicants to pump enough money into the community surrounding the landfill to trump significant environmental concerns about the proposed project, that concern is not triggered in this instance where the potential harms of the project were found to be effectively mitigated and the very benefit considered was directly aimed at protecting the environment surrounding the Landfill.

Based on the forgoing, the order of the EHB is affirmed.

## ORDER

AND NOW, this 28th day of February, 2006, the order of the Environmental Hearing Board in the above-captioned case is hereby affirmed.